**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| HUAWEI TECHNOLOGIES CO. LTD, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | No. 2:16-CV-00052-JRG-RSP |
| T-MOBILE US, INC. and T-MOBILE U.S.A., INC., | § § § § | |
| Defendants. | § | |

**MEMORANDUM OPINION**

In this patent case, the Court now considers T-Mobile's Motion to Strike Arguments From The Nettleton Initial Report [Dkt. # 261]. The Court will **GRANT** T-Mobile's Motion **IN PART**.

**I.     BACKGROUND**

**A.     Huawei's Infringement Contentions and the New Infringement Theory**

Huawei's U.S. Patents 8,069,365 and 8,719,617 relate to a wireless communication network component called an IP Multimedia Subsystem, or "IMS," that facilitates certain packet-based communications (e.g., Internet access and web services) over the network. The IMS includes a Serving CSCF (S-CSCF), which acts as the core of the network service processing and is "quite important to . . . the high reliability of the IMS." '365 Patent at 1:28–33.

Generally, Huawei's asserted claims concern "IMS Restoration," a feature that allows quick recovery (relative to the prior art) of IMS network service should a particular S-CSCF fail. Claims 1, 3, and 27 of the '365 Patent, and claim 1 and claim 4 of the '617 Patent, focus on the method of IMS Restoration. Claims 5, 7, and 10 of the '617 Patent are directed to S-CSCFs configured (e.g., loaded with software) to perform IMS Restoration.

Huawei's original infringement contentions alleged

> the Asserted Claims are infringed by T-Mobile's 2G, 3G, and 4G3 LTE wireless networks operated across the country for use by others at TMobile's encouragement (collectively referred to as the "Accused Instrumentalities" or "Infringing Wireless Networks"). The Accused Instrumentalities include the sub-systems, products, components, and software thereof that are made, used, or offered by or for T-Mobile, including as used with third party products and systems. For example, the Accused Instrumentalities include, but are not limited to, hardware and software components such as a . . . Serving Call Session Control Function ("S-CSCF").

Orig. Infringement Contentions (June 16, 2016) [Dkt. # 261-7] at 3 (footnote omitted). Huawei later amended its contentions to add references to S-CSCFs provided by T-Mobile suppliers Mavenir and Nokia. *See* Second Supp. to Infringement Contentions (May 17, 2017) [Dkt. # 261-8] at 4–5. Although Huawei's contentions have always included *general* allegations of "making" components of the network, they have never *specifically* alleged T-Mobile is liable for infringement by *making* S-CSCFs using the Mavinir and Nokia software.

Dr. Ray Nettleton's expert report changed that. Nettleton, who is Huawei's infringement expert, asserted T-Mobile "makes" the accused S-CSCF by "installing on hardware

(which is making) . . . the S-CSCF software product in claims 7 and 10 [of the '617 Patent]." Nettleton Rep. (June 5, 2017) [Dkt. # 261-1] ¶ 591. T-Mobile complains this is a new infringement theory outside the scope of Huawei's contentions and asks the Court to prohibit Nettleton from testifying on this point. T-Mobile's Motion [Dkt. # 261] at 9–12. Huawei counters this part of Nettleton's report falls under its infringement contentions as amended throughout the case. Huawei's Resp. [Dkt. # 280] at 5–8.

### B.    The Adverse Inference

T-Mobile also complains Dr. Nettleton improperly draws an adverse inference from T-Mobile's assertion of attorney-client privilege during a deposition of Erik Kosar, a T-Mobile engineer and Rule 30(b)(6) witness. During the deposition, Huawei repeatedly asked Kosar why T-Mobile put implementation of IMS Restoration on hold. But each time Huawei approached the subject, T-Mobile's counsel instructed Kosar not to answer on the basis of attorney-client privilege:

> Q. Do you know why the [IMS Restoration] was placed on hold as of August 3rd, 2016?
>
> MS. ZALEWSKI: Object, because the question might call for attorney-client privileged communications. If you can answer without revealing attorney-client privileged communications, then you can do so.
>
> A. I can't answer that question.
>
> Q. Can you not answer that question because to do so would reveal attorney-client communication?
>
> MS. ZALEWSKI: I'm not even going to let him answer that question.

>MR. BONILLA: You're going to instruct him not to answer that question?
>
>MS. ZALEWSKI: Yes. I'm going to instruct him not to answer that question. We've already gone through this.
>
>Q. Are you going to follow your counsel's instruction?
>
>A. I am.
>
>Q. If she had not instructed you not to answer, could you have answered?
>
>MS. ZALEWSKI: Again, I'm going to instruct the witness not to answer. We're getting into attorney-client privilege. I think we're done with this line of questioning.
>
>Q. Are you going to follow her instruction?
>
>A. I am.

Kosar Dep. (Apr. 28, 2017) [Dkt. # 261-4] at 108:16–109:18; *see also id.* at 116:24–118:8, 144:10–146:13.

Based only on this assertion of privilege, Nettleton wrote "T-Mobile claims that it never enabled [the IMS Restoration feature] in its production networks or proceeded to testing the feature in production *because it was advised against doing so by its counsel in this litigation.*" Nettleton Rep. (June 5, 2017) [Dkt. # 261-1] ¶ 479 (emphasis added); *see also* Nettleton Dep. (July 13, 2017) [Dkt. # 261-2] at 81:6–21, 85:6–22.

T-Mobile now asks the Court to preclude Nettleton from testifying about the reasons he believes T-Mobile put the implementation of IMS Restoration on hold.

## II. APPLICABLE LAW

An expert witness may provide opinion testimony if "(a) the expert's scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993).

District courts are accorded broad discretion in making Rule 702 determinations. *Kumho Tire*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Although the Fifth Circuit has identified various factors the district court may consider, the common nature of these factors directs the trial court to consider as its ultimate inquiry whether the expert's testimony is sufficiently reliable, relevant, and non-prejudicial to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.");

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002) ("[t]he trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system. . . . Thus, while exercising its role as a [gatekeeper], a trial court must take care not to transform a *Daubert* hearing into a trial on the merits") (quoting Fed. R. Evid. 702 advisory committee note). Instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant so as to be appropriate for the jury's consideration. *See Pipitone*, 288 F.3d at 249–50. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

Finally, in addition to Fed. R. Evid. 702, courts should consider other applicable rules when assessing expert testimony. *Daubert*, 509 U.S. at 595. Fed. R. Evid. 703, for example, provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* (quoting the rule). And Fed. R. Civ. P. 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* (quoting the rule).

## III. DISCUSSION

### A. The New Infringement Theory

T-Mobile argues Dr. Nettleton's report changes Huawei's infringement theory from "using" the accused S-CSCF to "making and using" the accused S-CSCF. This, says T-Mobile, is impermissible because the alleged "making" of the accused S-CSCF by T-Mobile was not specifically asserted as an "act" in Huawei's infringement contentions as required by P.R. 3-1(b). T-Mobile's Motion [Dkt. # 261] at 10.

T-Mobile, however, misinterprets the meaning of "act" in that rule. P.R. 3-1(b) rule does not require a defendant to articulate whether the alleged infringement is by making, using, importing, or any of the other prohibited activities of 35 U.S.C. § 271. Rather, the rule requires the plaintiff to identify the accused instrumentalities and how they meet the limitations of the claims on an element by element basis. Thus, the "act" to which P.R. 3-1(b) refers is an act that allegedly satisfies a limitation of an asserted method claim, not an act of making, using, or selling prohibited by § 271.

Here, Nettleton is not identifying a new accused instrumentality. At worst, Huawei is merely changing its underlying allegation from "using" the already accused S-CSCF to "using and making" the already accused S-CSCF. That sort of change has no bearing on whether the S-CSCF is covered by the asserted claims. Nor does it have any bearing on claim construction or T-Mobile's invalidity contentions. Thus, it doesn't implicate the disclosure requirements of, or the underlying reasons for, P.R. 3-1(b).

Accordingly, the Court will deny this part of T-Mobile's motion.

### B.     The Adverse Inference

In urging the Court to prohibit Nettleton's "adverse inference" testimony, T-Mobile relies primarily on *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004). In *Knorr-Bremse*, the court held an adverse inference that a legal opinion was or would have been unfavorable should not be drawn from an accused infringer's invocation of privilege. *Knorr-Bremse*, 383 F.3d at 1345.

There are, however, at least two distinctions between *Knorr-Bremse* and this case. First, *Knorr-Bremse* concerns willfulness, whereas the inference here presumably concerns infringement. Second, in *Knorr-Bremse* it was the factfinder who made the inference, whereas here it is an expert witness. Thus, *Knorr-Bremse* is not precisely on point.

Nonetheless, the Court concludes Dr. Nettleton *should* be prohibited from testifying about what he inferred from T-Mobile's assertion of privilege during Kosar's deposition. For one, Nettleton is Hauwei's technical expert on *infringement*—not on inferences to be made from the assertion of attorney-client privilege. It is trial counsel's role—not Dr. Nettleton's—to argue what inferences should be made from the evidence. Given that, the testimony at issue should be prohibited under Fed. R. Evid. 702 as improper.

Moreover, even though *Knorr-Bremse* is not precisely on point, it is helpful. Clearly *Knorr-Bremse* prevents the factfinder from drawing an adverse inference as to the nature of the advice based on the assertion of privilege. *Knorr-Bremse*, 383 F.3d at 1345 ("the assertion of attorney-client and/or work-product privilege . . . shall no longer entail an adverse inference as to the nature of the advice"). Thus, even if Nettleton testifies about the

inference he made, the jury would have to be instructed not to consider it. Thus, allowing Nettleton to testify about what he inferred concerning T-Mobile's privilege assertion has little value to the case but the potential for substantial prejudice. Accordingly, Nettleton's testimony on this point should also be prohibited under Fed. R. Evid. 403.

Huawei argues that granting T-Mobile's motion as to Nettleton's testimony would be unfair because it is the only way Huawei can rebut T-Mobile's expert's testimony that T-Mobile has no plans to enable IMS Restoration. This is especially true, says Huawei, given that T-Mobile is hiding behind privilege.

But when a party is "hiding behind privilege," the better course is to raise propriety of the privilege assertion with the Court, not have an expert draw an inference from a deponent's silence. That Huawei chose the latter does not compel the Court to allow testimony about that inference in contravention of the Federal Rules of Evidence.

The Court will grant this part of T-Mobile's motion.

### IV.  CONCLUSION AND ORDER

The Court **GRANTS-IN-PART** T-Mobile's Motion to Strike Arguments From The Nettleton Initial Report [Dkt. # 261]. Specifically, the Court **GRANTS** T-Mobile's Motion as to Paragraph 479 of Dr. Nettleton's report. The Court **ORDERS** that Huawei may not proffer testimony from Dr. Nettleton as to his inference that T-Mobile's counsel advised it against enabling or testing IMS Restoration in its production networks.

The Court otherwise **DENIES** the motion.

**SIGNED this 4th day of September, 2017.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE