IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| HUAWEI TECHNOLOGIES CO. LTD, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 2:16-CV-00052-JRG-RSP |
| | § | |
| T-MOBILE US, INC. and | § | |
| T-MOBILE U.S.A., INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

In this patent case, the Court now considers Huawei's Motion to Strike Portions of Craig Bishop's Report [Dkt. # 252]. The Court will **DENY** the motion.

### I.   BACKGROUND

#### A.   The Technology

Huawei's U.S. Patents 8,069,365 and 8,719,617 relate to a wireless communication network component called an IP Multimedia Subsystem, or "IMS." This subsystem facilitates certain packet-based communications (e.g., Internet access and web services) over the network. The IMS includes a Serving Call Session Control Function (S-CSCF), which acts as the core of the network service processing and is "quite important to . . . the high reliability of the IMS." '365 Patent at 1:28–33.

Generally, Huawei's asserted claims concern "IMS Restoration," a feature that allows quick recovery (relative to the prior art) of IMS network service should a particular

S-CSCF fail. Claims 1, 3, and 27 of the '365 Patent, and claims 1 and 4 of the '617 Patent, focus on the method of IMS Restoration. Claims 5, 7, and 10 of the '617 Patent are directed to S-CSCFs configured (e.g., loaded with software) to perform IMS Restoration.

Huawei's original infringement contentions alleged

> the Asserted Claims are infringed by T-Mobile's 2G, 3G, and 4G3 LTE wireless networks operated across the country for use by others at TMobile's encouragement (collectively referred to as the "Accused Instrumentalities" or "Infringing Wireless Networks"). The Accused Instrumentalities include the sub-systems, products, components, and software thereof that are made, used, or offered by or for T-Mobile, including as used with third party products and systems. For example, the Accused Instrumentalities include, but are not limited to, hardware and software components such as a . . . Serving Call Session Control Function ("S-CSCF").

Orig. Infringement Contentions (June 16, 2016) [Dkt. # 261-7] at 3 (footnote omitted). Huawei later amended its contentions to add references to S-CSCFs provided by T-Mobile suppliers Mavenir and Nokia as accused instrumentalities. *See* Second Supp. to Infringement Contentions (May 17, 2017) [Dkt. # 261-8] at 4–5. Although Huawei's contentions have always included *general* allegations of "making" components of the network, they have never *specifically* alleged T-Mobile is liable for making S-CSCFs by installing the Mavinir and Nokia software or hardware.

### B.     T-Mobile's Allegedly New Noninfringement Theory

In September 2016, Huawei asked T-Mobile to provide the factual and legal bases for its contention that it does not infringe the asserted claims. Huawei's First Set of Interrogs. to Defs. [Dkt. # 252-1] at 11–12 (Interrog. No. 8). In response, T-Mobile identified

the limitations of the asserted claims it contends are missing from the accused instrumentalities and stated IMS Restoration is disabled in T-Mobile's networks. Defs.' Fourth Supp. Objs. & Resps. [Dkt. # 252-2] at 34–42. T-Mobile, however, did not specifically address whether it *makes* the accused S-CSCFs.

That brings us to the parties' expert reports. First, Huawei's infringement expert, Dr. Ray Nettleton, reported that T-Mobile "makes" the accused S-CSCF by "installing on hardware (which is making) . . . the S-CSCF software product in claims 7 and 10 [of the '617 Patent]." Nettleton Rep. (June 5, 2017) [Dkt. # 274-8] ¶ 591. Then Craig Bishop, T-Mobile's noninfringement expert, reported that T-Mobile does not infringe the apparatus claims of the '617 Patent by "making" the accused S-CSCFs because T-Mobile's "vendors, not T-Mobile, install the [S-CSCF] nodes and the software." Bishop Rep. (June 30, 2017) [Dkt. # 274-10] ¶ 94.

Huawei claims Bishop's theory of noninfringement should have first been disclosed in response to Huawei's earlier interrogatory. Huawei's Mot. [Dkt. # 252] at 2. Therefore, says Huawei, Bishop should be precluded from offering this testimony at trial.

C.  **Bishop's Conversations With Ben Goldberg**

The second issued raised by Huawei concerns Bishop's opinions about the Mavenir and Nokia source code used for the accused S-CSCFs. Specifically, Huawei complains Bishop relied on a previously undisclosed person to help him review the source code. Huawei's Mot. [Dkt. # 252] at 2–3.

The source code is written in the C programming language. Bishop Dep. (July 12, 2017) [Dkt. # 252-7] at 27:7–9. Although Bishop holds a master's degree in computer science and a bachelor's degree in electrical engineering, he is not an expert in C. *Id.* at 28:12–13; Bishop CV [Dkt. # 252-16] at 5. Therefore he reviewed the source code with Ben Goldberg, a T-Mobile "code expert" who "explained to [Bishop] where certain things were done." Bishop Dep. (July 12, 2017) [Dkt. # 252-7] at 55:17–56:4.

Huawei complains (1) Bishop is not qualified to testify as to the operation of Mavenir's and Nokia's source code, and (2) it has been prejudiced because it did not have the opportunity to examine Goldberg. Huawei's Mot. [Dkt. # 252-9] at 9–10.

### D. The New KPI Data and Bishop's Conversations With Shujaur Mufti

The last issue raised by Huawei relates to Bishop's reliance on data not provided to Huawei until after Huawei served its own experts' reports. T-Mobile produced the new data on June 23, 2017—weeks after Huawei served its opening reports and only seven days before T-Mobile served its rebuttal reports. Letter From Aglipay to Bruce (June 23, 2017) [Dkt. 252-8].

The data at issue are key performance indicators (KPIs) for T-Mobile's accused networks. KPI data is created from software counters incremented on network components when certain events occur. Nettleton Rep. [Dkt. # 274-8] ¶ 496. For IMS Restoration, Mavenir provides counters to show restoration attempts, successes, and failures. Mavenir mOne IMS CSCF Performance Counters Reference Guide [Dkt. # 274-11] at 121.

Thus, the KPI data at issue is probative of whether IMS Restoration is enabled and, therefore, whether the asserted claims are infringed.

T-Mobile already produced some KPI data from July 2016 through March 2017. *See* [Dkt. # 274-12]. That data, however, did not indicate whether it related to T-Mobile's customer-facing production networks, its staging (i.e., testing) networks, or both. *Id.* In contrast, the more recent KPI data—that is, the KPI data about which Huawei now complains—provides the same data over the same time period as the earlier KPI data, but separates the KPI of the production networks from the KPI of the non-production networks. [Dkt. # 274-18]; [Dkt. # 274-19].

Bishop also relies on a conversation with T-Mobile engineer Shujaur Mufti, after the close of fact discovery, to support his conclusion the earlier KPI data—that is, the KPI data relied on by Nettleton in his infringement report—pulled from T-Mobile's staging environment nodes as well as its customer-facing production nodes. Bishop Rep. (June 30, 2017) [Dkt. # 252-6] ¶ 78. Mufti previously testified the earlier KPI data reflected T-Mobile's "network activity." Mufti Dep. (Apr. 28, 2017) [Dkt. # 252-9] at 193:4–7.

Huawei complains Dr. Nettleton couldn't consider the most recently produced KPI data before serving his report and Huawei never had an opportunity to question any witnesses concerning the newer KPI data.

## II.  APPLICABLE LAW

An expert witness may provide opinion testimony if "(a) the expert's scientific,

technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993).

District courts have broad discretion in making Rule 702 determinations. *Kumho Tire*, 526 U.S. at 152 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). Although the Fifth Circuit has identified various factors the district court may consider, the common nature of these factors directs the trial court to consider as its ultimate inquiry whether the expert's testimony is sufficiently reliable, relevant, and non-prejudicial to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.");

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002) ("[t]he trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system. . . . Thus, while exercising its role as a [gatekeeper], a trial court must take care not to transform a *Daubert* hearing into a trial on the merits") (quoting Fed. R. Evid. 702 advisory committee note). Instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant so as to be appropriate for the jury's consideration. *See Pipitone*, 288 F.3d at 249–50. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

Finally, in addition to Fed. R. Evid. 702, courts should consider other applicable rules when assessing expert testimony. *Daubert*, 509 U.S. at 595. Fed. R. Evid. 703, for example, provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.* (quoting the rule). And Fed. R. Civ. P. 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* (quoting the rule).

### III. DISCUSSION

#### A. The New Noninfringement Theory

Huawei claims T-Mobile should have identified, in response to its noninfringement contention interrogatory, its position that it does not infringe by "making" the S-CSCF nodes because the nodes are already made when delivered to T-Mobile. Huawei's Mot. [Dkt. # 252] at 8. But because T-Mobile didn't do so until Bishop's rebuttal report, Huawei says Bishop should be precluded from proffering that position at trial. *Id.* at 9.

Courts recognize that answers to contention interrogatories evolve over time as theories of liability and defense take shape. *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280 (Fed. Cir. 2012). In fact, answers to contention interrogatories may not come into focus until the end of discovery. *Id*. Also, as Huawei has recognized, the scope of infringement contentions and the scope of expert reports are not necessarily coextensive. Huawei's Resp. to T-Mobile's Mot. to Strike Arguments From the Nettleton Rep. [Dkt. # 280] at 5 (citing *Core Wireless Licensing, S.A.R.L. v. LG Elecs. Inc.*, No. 2:14-cv-00911, 2016 WL 3655302 (E.D. Tex. Mar. 21, 2016)).

Here, not until Nettleton's report did Huawei specifically assert its "making by installing" allegations based on the Mavinir and Nokia source code. Until then, Huawei merely generally alleged "[t]he Accused Instrumentalities include the sub-systems, products, components, and software thereof that are made, used, or offered by or for T-Mobile." Orig. Infringement Contentions (June 16, 2016) [Dkt. # 261-7] at 3. The Court finds T-

Mobile could not have reasonably anticipated Nettleton's specific contention prior to receiving his report. Put another way, T-Mobile could have reasonably concluded Huawei only alleged infringement by *use* of the accused S-CSCFs rather than by making them. Given that, Bishop should not be prevented from addressing Nettleton's contention, and the Court will deny this part of Huawei's motion.

### B. Bishop's Source Code Review

Huawei asks the Court to preclude any testimony by Bishop pertaining to the specifics of Mavenir's and Nokia's source code. First, Huawei contends Bishop is not qualified to opine on the source code. Huawei's Mot. [Dkt. # 252] at 9. Second, Huawei contends T-Mobile failed to disclose Ben Goldberg, with whom Bishop reviewed the code. *Id.* at 10.

The Court rejects Huawei's argument that Bishop is not qualified to render an opinion. Even though he isn't an "expert" on the C programming language, he is experienced with it. He holds a master's degree in computer science and a bachelor's degree in electrical engineering. In any event, the issue here is not so much the source code itself as its functionality—that is, whether IMS Restoration is enabled. The Court is satisfied Bishop has the requisite expertise to understand and review the source code to render a sufficiently reliable opinion about whether IMS Restoration is enabled in the accused S-CSCFs. Moreover, Huawei's source-code expert can reach his own conclusion, and Huawei can cross-examine Bishop on the specifics of the code and his review at trial.

As to Bishop's conversations with Goldberg, an expert witness is free to rely on

inadmissible testimony in forming his opinion. Rather than exclude Bishop's testimony on this point, the better option is vigorous cross-examination of Bishop by Huawei.

The Court will deny this part of Huawei's motion.

### C. The New KPI Data and Bishop's Conversations With Shujaur Mufti

Finally, Huawei contends Bishop's reliance on the new KPI data and Mr. Mufti is unduly prejudicial to Huawei because it had no opportunity to review the information and examine Mufti. Huawei's Mot. [Dkt. # 252] at 10–12. And, says Huawei, its expert did not have the information available to him before serving his infringement report. *Id.*

The Court disagrees with Huawei for two reasons. First, the new KPI data and Bishop's rebuttal report were served well before Bishop and Nettleton were deposed. T-Mobile produced the new KPI data on June 23, 2017. Letter From Aglipay to Bruce (June 23, 2017) [Dkt. 252-8]. Huawei examined Bishop three weeks later. Bishop Dep. (July 12, 2017) [Dkt. # 252-7] at 1. T-Mobile examined Nettleton the day after Bishop's deposition. Nettleton Dep. (July 13, 2017) [Dkt. # 274-9] at 1. Huawei therefore had ample opportunity to discuss the newer KPI data with both experts.

Second, Huawei's position would require T-Mobile to predict, and then preemptively respond to, Hauwei's expert's specific contentions before they are even made. Here, for example, T-Mobile would have had to anticipate Nettleton's conclusion that, based on the earlier-provided KPI data, "T-Mobile conducted a test of the infringing IMS Restoration procedure in its components production network, or had at least enabled the IMS Restoration feature in its network." Clearly, T-Mobile doesn't see that as a defensible position

and, given the specificity of Nettleton's conclusion, the Court finds it unreasonable to expect T-Mobile to know in advance what information it would need to adequately rebut a conclusion that had not yet been made.

In addition to the timing of the production, Huawei urges the Court to consider the parties' history concerning the production of the earlier KPI data. Huawei's Mot. [Dkt. # 252] at 11. According to Huawei, T-Mobile agreed to produce KPIs related to successful and failed restoration attempts by T-Mobile's S-CSCFs. *Id.* at 12 (citing [Dkt. # 181-2] at 5). Huawei argues T-Mobile never suggested the data would reflect anything other than the operation of its customer-facing production network. *Id.*

That may be true, but that argument assumes T-Mobile understood Huawei's request to be limited to T-Mobile's customer-facing production network. It also assumes T-Mobile knew in advance what the KPI data was going to show and how Huawei would interpret the data. The Court is not convinced either assumption is accurate.

As a final matter, Huawei's "prejudice" argument suggests the newly produced KPI data is wholly unrelated to the previously produced KPI data, but that's not accurate. Instead, the newer KPI data includes that same data points in the earlier KPI data, but they are organized differently. Specifically, instead of combining the production and staging networks for its query, the later KPI data shows the KPI for the production networks separately from the KPI for the staging networks. Otherwise the data is the same, which weakens Huawei's position it has been prejudiced.

Here, too, the better approach is vigorous cross-examination of Bishop at trial rather

than preclusion of his testimony. The Court will therefore deny this aspect of Huawei's Motion.

## IV. ORDER

The Court **DENIES** Huawei's Motion to Strike Portions of Craig Bishop's Report [Dkt. # 252].

**SIGNED this 10th day of September, 2017.**

							_____
							ROY S. PAYNE
							UNITED STATES MAGISTRATE JUDGE